# Supreme Court of Florida

_____

No. SC18-150
_____

**SHAWN ROGERS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 5, 2019

PER CURIAM.

Shawn Rogers appeals his conviction and death sentence for the first-degree murder of Ricky Dean Martin. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons we explain, we affirm the conviction and sentence.

## I. BACKGROUND

On March 30, 2012, Shawn Rogers was an inmate at the Santa Rosa Correctional Institution, serving a life sentence for a 2002 conviction for robbery with a firearm and a concurrent fifteen-year sentence for aggravated battery with a firearm arising out of the same incident. That afternoon, Rogers was moved into cell D1-117, where he would become cellmates with another inmate, Ricky Dean

Martin. Prior to the move, both Rogers and Martin were asked if they had a problem with the move, and they both indicated that they did not. At 7 p.m. that evening, a routine security check was conducted by corrections staff. Officer Beaudry conducted the check of cell D1-117. At that time, Beaudry saw both Rogers and Martin, Rogers asked Beaudry for the time, and neither inmate indicated that he was having a problem with the other.

At approximately 7:10 p.m., Officer Givens noticed that many inmates on the wing were being loud and carrying on more than normal. Givens began to walk around to try to determine which inmates were making noise. When Givens arrived at cell D1-117, Rogers was standing at the door and said to Givens, "Hey man. He's cutting himself. Y'all need to get in here and stop him." Rogers was referring to Martin and complaining that Martin was harming himself. Through the window in the cell door, Givens observed Martin lying on the ground with a prayer rug covering his head and most of his body down to his waist. Martin appeared to be lying on his back with his hands behind his back, his elbows slightly protruding from under the rug, and oriented with his feet closest to the door. Givens directed Martin to show his hands and stop cutting himself, but Martin did not respond. Givens could see blood on the floor around Martin and on the walls beside him.

Based on his training and in an attempt to stop Martin from cutting himself, Givens deployed pepper spray at Martin's exposed elbow through the handcuffing portal in the cell door. In reaction to the spray, Martin rolled onto his side, and Givens could see then that his hands were tied behind his back with white strips of cloth, which were made from a torn bedsheet. Givens then called for assistance, and Rogers, who was cooperative and appeared to be uninjured, was removed from the cell and secured in a shower area, where another inmate observed him drop a small object into the shower drain.

Once officers entered cell D1-117 and removed the prayer rug from Martin, they observed Martin with a string tied around his neck, hands tied behind his back, feet tied together, pants pulled down, and a pair of boxers over his head. There were bloody handprints on one of the cell walls near his body. Once the boxers were removed from Martin's head, it became apparent that he had severe facial injuries. Martin was unresponsive, and his breathing was becoming increasingly labored, so he was transported to the prison's on-site emergency room.

At the on-site emergency room, Martin had a seizure, and a registered nurse determined that he appeared to have severe brain damage. Martin was gurgling blood in his mouth and was turned on his side to have the blood suctioned out of his mouth. When Martin was turned on his side, matter or bodily fluids came out

of his ear, and the nurse observed that part of one ear was missing. Because of the severity of his injuries, Martin was transported from the prison to a local hospital for further treatment.

Martin was admitted to the hospital with extensive head injuries, diagnosed with an intracranial hemorrhage, and given a poor prognosis. Martin had no neurological response and was placed on a ventilator due to respiratory failure. Over the next few days, Martin's respiratory condition continued to deteriorate, and he developed pneumonia. Nine days after the attack, Martin was declared brain dead and taken off life support. He was pronounced dead at 11:36 a.m. on April 8, 2012.

Rogers was subsequently charged in Martin's death with first-degree murder and kidnapping to terrorize or inflict bodily harm. The State provided notice that it intended to seek the death penalty. Rogers demanded a speedy trial and elected to represent himself throughout the guilt phase and for a portion of the penalty phase before electing to be represented by counsel instead.

During the guilt phase, the medical examiner, Dr. Minyard, testified that an autopsy revealed the cause of Martin's death to be blunt impact to his head and the manner of death to be homicide. Martin had several external injuries to his face and scalp, caused by blunt force trauma, and wounds made by a sharp weapon on his chest and left upper extremity. Martin's brain was severely injured, with

subdural hemorrhaging apparent.  Dr. Minyard opined that it was possible that Martin's injuries could have been sustained in less than five minutes.

Rogers chose to testify during the guilt phase and gave his version of the events surrounding the murder.  Rogers claimed that when he was transferred into Martin's cell, it was filthy.  Rogers started cleaning the cell and "talking shit" to Martin, calling him "a dirty-ass cracker" and "filthy motherfucker," and "cussing him out" "real aggressively."  Rogers finished cleaning and got on the top bunk to listen to the radio.  When Rogers looked down, he noticed that Martin was cutting himself with some type of razor or sharp, metal object.  Rogers believed that Martin felt he needed to get moved out of the cell away from Rogers and was likely cutting in an attempt to get transferred to the medical wing.  Rogers jumped down from the top bunk and said to Martin, "What the fuck's wrong with you, man?  You're acting like a little bitch."  Rogers told Martin that if he did not stop cutting himself, Rogers was going to put his foot in Martin's ass.  Martin kept saying, "Oh, I got to get up out of here."  At that time, Rogers put a shirt over the window in the cell door.  According to Rogers, this is done when inmates want to fight without getting in trouble.  Martin then started yelling and making a lot of noise.  Rogers threw a combination of three or four punches at Martin, and when Martin fell down, Rogers started kicking him in the face.  Rogers stomped Martin's head into the concrete six or seven times.  Martin was screaming and yelling like

he was in pain during the attack.  Rogers said that Martin kept trying to get up and that is how the bloody handprints got on the cell wall.  When Martin tried to get up, Rogers knocked him back down and continued to kick him.  Rogers described a portion of the attack as follows:

> I kicked him in the face and said, [t]his is for Trayvon Martin, motherfucker.  I kicked him in the face again and said, [t]his is for Trayvon Martin, motherfucker.  I kicked him a third time and said, [t]his is for Trayvon Martin, you pussy-ass fuck boy.  I kicked him in the face a fourth time and said, [t]his is for Martin Luther King.  I kicked him in the face a fifth time and said, [t]his is for Emmett Till and all the other black people you crackers done killed.

Rogers said Martin never came at Rogers or had a chance to try to throw a punch at him.  Martin was just sitting there when Rogers started beating him and he was helpless to every blow and punch and kick that Rogers delivered.  When Rogers realized that Martin was not going to stop trying to get up, he tore up a bedsheet and used the strips of cloth to tie Martin up.  Rogers also put cloth in Martin's mouth and "tied his mouth up so he couldn't scream no more."  When asked if Martin was still moving and trying to get up while Rogers was tearing the bedsheets, Rogers responded, "Yea.  Like – I don't know.  I guess like – kind of like when you step on a roach, man.  They still be alive, but they still be moving."  Rogers described the end of the attack:

> By then, he was beat up bad and breathing hard, and I asked all the brothers on the wing, Who wants me to kill this pussy-ass cracker?  A lot of them said, Yeah.  But my lil' homie Y.O., Steve Young, said, Big Brother, don't kill that cracker just put him on the door.  I said,

Bro, God going to bless you, Y.O., because I was going to kill this fuck boy on the strength -- I said, Blue Flame Midnight Crip Gang.

Then Mr. Martin's gang brothers started cussing me out and threatening me about what they going to do. Now, I never raped Mr. Martin or slapped him on his ass, but I pretended I did and made the slapping sounds to make his brother -- his gang brothers mad.[1] And I covered him up with a prayer rug and pulled his pants down to make his gang brothers think that it was real.

Rogers went on to tell the jury:

Ladies and gentlemen of the jury, if you're asking yourself if I beat Mr. Martin up about the murder of Trayvon Martin, my honest answer is, you're goddamn right I did, but there was also other factors. When I first met Mr. Martin and looked him in his eyes, I knew all for real what he was all about. He was a straight bitch, a snitch, and an undercover racist. That's the vibe he gave off. I'm from Brooklyn, New York[,] and been in the streets my whole life, so my instincts are good when it comes to reading people.

And the more I got to learn about Mr. Martin, my suspicions had been confirmed. Mr. Martin is everything I despised in life: A snitch, a coward, and a straight fuck boy. I got no love for [the] dude or no sympathy. I don't feel bad about it. I don't feel no remorse. I'm not losing any sleep over the death of Ricky Martin and neither is anybody else.

. . . .

Convicts know how to do time, inmates don't. Ricky Martin was an inmate, a cry baby, a cutter, not even man enough to stand up in his pants for what he claimed he believed in. He would rather tell the police if he got a problem and check-in with protective custody. I would never have no sympathy for no buster like that.

. . . .

And I believe in the Midnight Crip Gang to the fullest. I've been A-1 since day one, from Spofford Juvenile Detention Center in

---

1. Rogers had testified previously—and that testimony was admitted at trial—that after Martin was tied up, Rogers pulled down Martin's pants and spanked him so everyone could hear, while yelling out, "This is some sweet cracker ass," with the intent of humiliating Martin.

New York, to Rikers Island, to Florida State [P]rison.  I'm a Midnight Crip, and I would be less of a man to get in front of the jury -- in front of y'all in this situation and pretend that it's anything different while there's brothers in the streets dying and catching life sentences everyday about this blue flag.

When my mom was smoking crack and my pops was nowhere to be found, it was the Crip Gang that took me in.  They been my family when I had no family.  When I was doing time and didn't have nothing, Crip made sure I had a care package.  Some people believe in religion and that's great, but I believe in my gang.  And I'm willing to die about that, I'm willing to live about that, and I'm down for whatever.  That's what you call true blue.

I said all this because I firmly believe that if you stand for something, you stand firm in your convictions regardless of the consequences.  The bottom line is I'm responsible for the death of Ricky Martin.  I accept that responsibility, but I also want it noted the negligence, stupidity, and incompetence of the Florida Department of Corrections.

I'm not going to change the way I do my time, and you can ask anybody that knows me, I've been the same way my whole life.  I don't change up.  I don't flip-flop.  You will always know where I stand and what I'm about because I've been thoroughly consistent all these years.  Loyalty is all I know.

. . . .

Society is not made for people like me.  Society is full of fake people, fake friendships, fake relationships, fake, but with me, what you see is what you get.  There's nothing fake or phony about me.  I'm O.G. Jigga Man, Midnight Crip Gang, 103 Eastside Trey'z up, and that's why I can get on this witness stand and look you, ladies and gentlemen, in the face, of the Jury, and tell you that I could care less about Ricky Martin, and I meant everything I said.

The jury found Rogers guilty as charged of first-degree premeditated murder or felony murder and kidnapping to terrorize or inflict bodily harm.

At the penalty phase, the State presented records of Rogers' prior felony convictions as well as his own admissions regarding those convictions, which were

- 8 -

made during a prior proceeding.  When Rogers was a minor, he was convicted as an adult for armed robbery with a firearm of an individual at a train platform.  Rogers was also convicted in 2002 of robbery with a firearm and aggravated battery with a firearm for robbing a cab driver, whom he struck with the firearm and knocked out a tooth.  The State also presented additional testimony from the medical examiner, Dr. Minyard, regarding the injuries Martin suffered.

In mitigation, Rogers presented evidence in the form of testimony from eight inmates regarding their interactions with Rogers.  The inmates described Rogers as "a humble soul," peaceful, "a straight-up dude" with "a good heart," a good friend who gives advice, encourages them to become educated, to work out, to eat healthy, and lends items to individuals who need them.  The inmates considered Rogers a good friend and mentor.

Rogers also presented testimony from a number of experts: Dr. Marvin Dunn, a community psychologist; Dr. Mark Rubino, a neurologist; Dr. Joseph Wu, a physician who specializes in neuropsychiatric imaging assessments of brain injury; and Dr. Julie Harper, a licensed psychologist.  Several of the experts testified regarding Rogers' difficult childhood.  Rogers was born in New York City and brought home from the hospital to a housing project.  His mother was a drug addict and psychiatrically unstable; he never knew his father.  When Rogers was two years old, his mother surrendered him to foster care.  From that point, Rogers

was placed in various foster homes and group homes, lived off and on with his maternal grandmother, and sometimes was placed back with his own mother. When Rogers was fourteen, he was placed in an inpatient psychiatric care facility. An assessment done at that time indicated that he could be impulsive and distractible with consequent poor judgment, which is consistent with attention deficit hyperactivity disorder (ADHD). He was also diagnosed with conduct disorder at that facility. He has also been diagnosed with major depressive disorder, anxiety disorder, and antisocial personality disorder (ASPD). After being released from the psychiatric facility, Rogers became involved with the department of juvenile justice, into whose custody he kept returning. Before the age of twenty, Rogers had several periods of incarceration in the New York Department of Corrections.

The experts also testified that Rogers has impulse control problems that are explained by his upbringing and head injuries suffered as a child. Dr. Rubino reviewed a CAT scan of Rogers' brain and opined that Rogers had at least one indication of traumatic brain injury in his frontal temporal region, a right frontal hygroma, and that portions of Rogers' brain, including the frontal lobe, had atrophied. Dr. Rubino said that when a person has an injury to his frontal temporal region, that person can have impulse control problems and loss of judgment and appreciation of consequences. Dr. Wu reviewed a PET scan of Rogers' brain, in

which he observed damage to the orbitofrontal areas of the brain, which are important for the regulation of aggressive impulses.

In rebuttal, the State called Dr. Greg Prichard, a forensic psychologist. Dr. Prichard diagnosed Rogers with ASPD. Dr. Prichard said that individuals with ASPD often have abnormal brain scans. Dr. Prichard testified that Rogers was in an adult prison in New York from the age of seventeen to twenty-one for attempted robbery and within a year of his release, Rogers hit a taxi cab driver in the mouth with a gun during another robbery and received a life sentence for that crime in Florida at age twenty-two in 2002. That same year, Rogers tied up his cellmate and beat him up. In 2005, Rogers again tied up a cellmate and beat him because Rogers said the man "disrespected" him. Rogers told Dr. Prichard that he felt like he beat that cellmate worse than Martin. In 2009, Rogers stabbed another inmate in the head with a knife and kneed another inmate in the face. As evidence of Rogers' ability to plan and premeditate, Dr. Prichard referred to a letter written by Rogers to a predecessor judge in which Rogers admitted that he had decided to kill the next white man he came across. He pointed out that in Rogers' letter to the predecessor judge, Rogers said that he intended to kill Martin in the cell that night and only stopped because another inmate begged him. Rogers bragged in the letter that he is a "ruthless, cold-blooded, cutthroat, gangsta [sic], blood killer, and killer of any and everything that go [sic] against the Crips gang." Rogers also stated that

he knows he is a sociopath and that he has no remorse, regard, or regret for anything he has done in his life.

During the charge conference, the defense made no objections to the aggravating factors, the final jury instructions, or the verdict form. After the instructions were read to the jury, the judge asked if the parties had any objections to the instructions as read, and both parties stated that they did not.

The jury was instructed that it must "unanimously determine whether the aggravating factors alleged by the State have been proven beyond a reasonable doubt." The jury was instructed to consider the following aggravating factors: (1) that Rogers was previously convicted of a felony and under sentence of imprisonment at the time he committed the murder; (2) that Rogers was previously convicted of felonies involving the use or threat of violence to another person, specifically robbery with a firearm, aggravated battery with a firearm, and attempted robbery; (3) that the murder was committed while Rogers was engaged in the commission of a kidnapping; (4) that the murder was especially heinous, atrocious, or cruel (HAC); and (5) that the murder was committed in a cold, calculated, and premeditated (CCP) manner without any pretense of moral or legal justification. Ultimately, the jury found unanimously that all five aggravating factors were proven beyond a reasonable doubt. The trial court also found that all five aggravators were proven beyond a reasonable doubt and assigned significant

weight to aggravator three—the murder was committed while Rogers was engaged in the commission of a kidnapping—and great weight to the other four aggravators.

The jury was also instructed to consider whether Rogers had established by the greater weight of the evidence the existence of any of the proposed sixty-eight mitigating circumstances. The proposed mitigating circumstances follow with the relevant findings made by the jury and the trial court and any weight assigned by the trial court detailed parenthetically: (1) the capital felony was committed while Rogers was under the influence of extreme mental or emotional disturbance (not found by the jury or court); (2) the capacity of Rogers to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (not found by the jury or court); (3) the age of Rogers at the time of the crime (not found by the jury or court); (4) Rogers suffers from major depression (not found by the jury; found by the court, very little weight); (5) Rogers has a history of multiple head injuries starting as a child (found to exist by jury vote of 10-2; moderate weight); (6) Rogers was born to a crack-addicted mother (not found by the jury or court); (7) Rogers does not know the identity of his father (not found by the jury; found by the court, no weight); (8) Rogers endured maternal abandonment (found by jury vote of 12-0; some weight); (9) Rogers endured paternal abandonment (not found by the jury; found by the court, little weight); (10) Rogers' mother is mentally ill (not found by the jury; found by

the court, very little weight); (11) Rogers' mother attempted suicide by jumping off a building with Rogers (not found by the jury; found by the court, little weight); (12) Rogers was emotionally abused and rejected by his mother (found by jury vote of 12-0; some weight); (13) Rogers was rejected by his maternal grandmother (not found by the jury or court); (14) Rogers was born into a dysfunctional family (found by jury vote of 12-0; some weight); (15) Rogers was separated from his biological brother, Christopher, as a toddler (found by jury vote of 9-3; some weight); (16) Rogers was separated from his biological brother, Kevin, who was born cocaine positive and removed at birth (not found by the jury; found by the court, very little weight); (17) Rogers was separated from his biological brother, Sherrod, who was born cocaine positive and removed at birth (not found by the jury; found by the court, very little weight); (18) Rogers was exposed to drugs at an early age by his mother, who made him inject her with drugs (not found by the jury; found by the court, some weight); (19) the death of Rogers' maternal grandmother was traumatic for him (not found by the jury or court); (20) Rogers never received grief counseling after the loss of his grandmother (not found by the jury or court); (21) Rogers has never been shown love or affection (not found by the jury or court); (22) Rogers loves his mother in spite of the maltreatment and neglect by her (not found by the jury; found by the court, very little weight); (23) Rogers loves his brother, Christopher (not found by the jury; found by the court,

very little weight); (24) Rogers has empathy for his mother (not found by the jury; found by the court, little weight); (25) Rogers has encouraged his brother to do well (not found by the jury; found by the court, very little weight); (26) Rogers has counseled his brother on the importance of his education (not found by the jury; found by the court, very little weight); (27) Rogers will continue to be a source of emotional support to his brother (not found by the jury or court); (28) Rogers lived on the streets when he was homeless (found by jury vote of 12-0; some weight); (29) Rogers grew up in poverty during developmental years (found by jury vote of 10-2; some weight); (30) Rogers spent his early years in the Marcy Projects in Brooklyn (found by jury vote of 5-7; some weight); (31) Rogers moved to multiple foster homes (found by jury vote of 8-4; some weight); (32) the psychological impact of being placed in foster care (found by jury vote of 9-3; some weight); (33) Rogers experienced inadequate nutrition as a child (not found by the jury or court); (34) Rogers attended at least eight schools by the age of thirteen (found by jury vote of 1-11; very little weight); (35) Rogers witnessed multiple violent acts in his neighborhood (found by jury vote of 10-2; some weight); (36) Rogers was sent to a children's group home, The Children's Village (not found by the jury; found by the court, very little weight); (37) Rogers was moved to another group home, Edwin Gould Academy (not found by the jury; found by the court, very little weight); (38) Rogers was admitted to a children's psychiatric hospital at the age of fourteen

(found by jury vote of 12-0; moderate weight); (39) Rogers did not have a stable childhood (found by jury vote of 12-0; some weight); (40) Rogers was exposed to racial tension and discrimination in his life (found by jury vote of 11-1; some weight); (41) Rogers suffers from brain damage (found by jury vote of 1-11; some weight); (42) Rogers suffers from neurological deficits (found by jury vote of 1-11; some weight); (43) Rogers was exposed to acts of violence while in high-security juvenile detention facilities (found by jury vote of 12-0; some weight); (44) Rogers sustained head trauma at age fourteen, when he was hit in the head with a metal pipe or metal chair or both, which resulted in metal fragments being left in his skull while in a juvenile detention facility (found by jury vote of 10-2; some weight); (45) Rogers sustained head trauma and loss of consciousness when he was hit by a car at the approximate age of eight or nine (not found by the jury or court); (46) Rogers seeks to improve his knowledge base by reading articles and news (not found by the jury; found by the court, very little weight); (47) Rogers has spent years in solitary confinement (found by jury vote of 5-7; little weight); (48) Rogers cared for homeless boys on the streets (not found by the jury or court); (49) Rogers has mentored other inmates (not found by the jury; found by the court, very little weight); (50) Rogers has shared food and hygiene products as well as paper, envelopes, and stamps with other inmates (not found by the jury; found by the court, very little weight); (51) Rogers encouraged the relationship between his

girlfriend, Chloe Johnson, and her mother (not found by the jury; found by the court, very little weight); (52) Rogers suffers from attachment issues (not found by the jury or court); (53) Rogers suffers from posttraumatic stress disorder (not found by the jury; found by the court, little weight); (54) Rogers has frontal lobe damage (not found by jury; found by court, some weight); (55) Rogers has signs of a presumptive diagnosis of chronic traumatic encephalopathy (not found by the jury; found by the court, some weight); (56) Rogers has suffered concussions (not found by the jury or court); (57) Rogers has neocortex damage (not found by the jury; found by the court, some weight); (58) Rogers has suffered a subdural hematoma as evidenced by a right frontal hygroma (found by jury vote of 2-10; some weight); (59) there is a disparity in Rogers' neuropsychological test, which is found in brain injury and consistent with Rogers' imaging studies (found by jury vote of 10-2; some weight); (60) Rogers is unable to calibrate or modulate his responses as a result of frontal lobe damage (not found by the jury or court); (61) Rogers is unable to conform his behavior due to a significantly compromised neocortex (not found by the jury or court); (62) Rogers suffers brain atrophy (found by jury vote of 2-10; moderate weight); (63) Rogers' judgment and decision-making are impaired (not found by jury or court); (64) Rogers has a lack of impulse control (not found by the jury or court); (65) Rogers cannot appreciate the consequences of his actions (not found by the jury or court); (66) Rogers suffers from racial hypersensitivity (not

found by the jury; found by the court, very little weight); (67) Rogers endured institutional failures (found by jury vote of 12-0; some weight); and (68) Rogers was diagnosed with ADHD (not found by the jury; found by the court, little weight).

The jury was also specifically instructed as follows:

[I]f your verdict is that the defendant should be sentenced to death, your finding that each aggravating factor exists must be unanimous, your finding that the aggravating factors are sufficient to impose death must be unanimous, and your finding that the aggravating factors found to exist outweigh the established mitigating circumstances must be unanimous, and your decision . . . to impose a sentence of death must be unanimous.

The jury unanimously found that the aggravating factors were sufficient to warrant a death sentence and that those factors outweighed the mitigating circumstances. The jury ultimately and unanimously concluded that Rogers should be sentenced to death.

Rogers subsequently waived his right to present additional evidence regarding mitigating circumstances at the *Spencer*[2] hearing, and the court appointed special counsel for that purpose. Dr. Jethro Toomer, a clinical and forensic psychologist, testified on Rogers' behalf at the *Spencer* hearing. Dr. Toomer testified that he did not "find any evidence of sociopathy or any diagnostic entities suggestive of antisocial personality disorder" and described Rogers'

_____

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 18 -

condition as "toxic stress syndrome," which "basically is a result of persistent exposure to traumatic and debilitating situations and environment."

At sentencing, the trial court made its own findings with respect to the aggravation and mitigation, finding that all five aggravators were proven beyond a reasonable doubt and that forty-nine mitigating circumstances were established. It assigned the weight to each aggravator and mitigator as detailed above, *see supra* pp. 12-18, and ultimately sentenced Rogers to death.

## II. ANALYSIS

### A. Sufficiency of the jury instructions during the penalty phase

Rogers first argues that the trial court erred in failing to instruct the jury that it must determine beyond a reasonable doubt whether the aggravating factors were sufficient to justify the death penalty and whether those factors outweighed the mitigating circumstances. Rogers concedes that he failed to request these instructions or object to the instructions as read to the jury but claims that the trial court's failure to instruct on the beyond a reasonable doubt standard for proof constitutes fundamental error. This argument is without merit.

In *Hurst v. State*, 202 So. 3d 40, 53 (Fla. 2016), this Court held that "before a sentence of death may be considered by the trial court in Florida, the jury must find the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating

- 19 -

factors outweigh the mitigating circumstances." But *Hurst* did not require that the

determinations at issue here—that the aggravating factors are sufficient to impose

death and that the aggravating factors outweigh the mitigating circumstances—be

made beyond a reasonable doubt. And when we amended Florida Standard

Criminal Jury Instruction 7.11—Final Instructions in Penalty Proceedings—

Capital Cases—last year in order to conform with the requirements of *Hurst v.*

*Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, we fully considered the

arguments made that the beyond a reasonable doubt standard of proof should apply

to the jury's determinations of sufficiency of the aggravation and weighing of the

aggravation and mitigation but ultimately declined to include a standard of proof

for these determinations. *See In re Standard Criminal Jury Instructions in Capital*

*Cases*, 244 So. 3d 172, 191-92 (Fla. 2018); Fla. Std. Jury Instr. (Crim) 7.11 (2018).

Even more recently, we explained in *Foster v. State*, 258 So. 3d 1248, 1252 (Fla.

2018),

> the *Hurst* penalty phase findings are not elements of the capital felony
> of first-degree murder. Rather, they are findings required of a jury:
> (1) *before* the court can impose the death penalty for first-degree
> murder, and (2) *only after* a conviction or adjudication of guilt for
> first-degree murder has occurred.

> To the extent that in *Perry v. State*, 210 So. 3d 630, 633 (Fla. 2016), we

suggested that *Hurst v. State* held that the sufficiency and weight of the

aggravating factors and the final recommendation of death are elements that must

be determined by the jury beyond a reasonable doubt, we mischaracterized *Hurst v. State*, which did not require that these determinations be made beyond a reasonable doubt. Since *Perry*, in *In re Standard Criminal Jury Instructions in Capital Cases* and *Foster*, we have implicitly receded from its mischaracterization of *Hurst v. State*. We now do so explicitly. Thus, these determinations are not subject to the beyond a reasonable doubt standard of proof, and the trial court did not err in instructing the jury.

**B. Admission of Rogers' letters to the predecessor judge and state attorney**

Rogers asserts that the trial court erred in admitting in their entirety during the guilt phase letters written by Rogers to a predecessor judge and the elected state attorney, which included his reflections on race, politics, and his own character and predispositions. Rogers claims that it was error to admit the letters in their entirety because portions of each were irrelevant and unfairly prejudicial. Because Rogers did not object to admission of the letters, we review this claim only for fundamental error, which we have "defined as error that 'reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.' " *Brooks v. State*, 762 So. 2d 879, 899 (Fla. 2000) (quoting *McDonald v. State*, 743 So. 2d 501, 505 (Fla. 1999)).

There are four specific portions of the letters that Rogers claims were admitted in error. In those portions, Rogers discusses being a black revolutionary, a member of the Crips, and a ruthless, cold-blooded, cutthroat gangster, how he feels it is necessary to seek vengeance when white people kill black people, his lack of remorse for the murder, that he has a tendency to be very violent with little or no provocation, that he sees his problem with violence "getting worse as the years go by" and that "[a]ll I think about every day is who I can hurt and who I can kill. . . . Next time it may be corrections staff," and states that this should be an easy case for the prosecution because he did kill Ricky Martin. Most of the statements to which Rogers objects were relevant, not outweighed by the danger of unfair prejudice, and cumulative to his guilt phase testimony, and their admission certainly does not rise to the level of fundamental error. The statements that Rogers sees his problem with violence "getting worse as the years go by" and that "[a]ll I think about every day is who I can hurt and who I can kill. . . . Next time it may be corrections staff" were irrelevant, and if Rogers had objected to them, the trial court likely would have sustained the objection. But Rogers did not object and these two statements in the context of the entire trial do not rise to the level of fundamental error.

Rogers also asserts that admission of the letters during the guilt phase amounted to a denial of due process and fundamental error in the penalty phase.

Rogers claims that by inflaming the jury's emotions, Rogers' reflections on race, politics, and his own character in the challenged portions of the letters precluded the jury from fairly judging the existence of the aggravating factors. This argument is unavailing. Because the challenged portions of the letters regarding Rogers' reflections on race and his own character were essentially cumulative to his own testimony during the guilt phase, there is no reasonable possibility that the admission of the letters in their entirety affected the jury's death recommendation. Even without the letters, the jury still would have heard from Rogers' own mouth that he uses racist terms, considers himself a brutal gangster who would do anything, even die, for his gang, that he has no intention of changing the way he acts in prison—which is fairly interpreted to mean that he will continue to attack people if he feels he should do so—and that he has no remorse for the murder. And the only challenged statement that may be considered a reflection on politics ("It's 2013 and we have the 1st African-American president in this country[,] who is disrespected on a regular basis by his so-called colleagues in the political arena based on the color of his skin.") was not prejudicial to Rogers.

Thus, we conclude that the admission of Rogers' letters did not amount to fundamental error with respect to either phase of the trial. Rogers is not entitled to relief on this claim.

## C. Application of the CCP aggravator

Rogers claims that the trial court erred in instructing the jury on the CCP aggravator and that the jury's and trial court's findings of the CCP aggravator are not supported by competent, substantial evidence. The record does not support this claim.

Rogers did not object to the jury being instructed on CCP. During the charge conference, he agreed with the proposed instruction, and after the jury was instructed, Rogers had no objection to the instructions as read. Because Rogers failed to object to the instruction, he did not properly preserve this claim for appellate review. Even if we were to consider this claim on its merits, we would conclude that Rogers is not entitled to relief because there was credible and competent evidence to support the CCP instruction and thus, the trial court did not err in giving the instruction.

Regarding the finding of CCP, "[t]he standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence." *Guardado v. State*, 965 So. 2d 108, 115 (Fla. 2007). "When reviewing a trial court's finding of an aggravator, 'it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court's job.' " *Aguirre-Jarquin v. State*, 9 So. 3d 593, 608

(Fla. 2009) (quoting *Willacy v. State*, 696 So. 2d 693, 695 (Fla. 1997)). We "review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent[,] substantial evidence supports its finding." *Id.* (quoting *Willacy*, 696 So. 2d at 695).

> In order to establish the CCP aggravator, the evidence must show: (1) "the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)"; (2) "the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)"; (3) "the defendant exhibited heightened premeditation (premeditated)"; (4) "the defendant had no pretense of moral or legal justification."

*Williams v. State,* 37 So. 3d 187, 195 (Fla. 2010) (quoting *Franklin v. State,* 965 So. 2d 79, 98 (Fla. 2007)); *see* § 921.141(6)(i), Fla. Stat. (2017).

Here, there was competent, substantial evidence in the record to support the finding of the aggravator. Dr. Prichard testified that the killing was not an act prompted by "emotional frenzy, panic, or a fit of rage," and that the fact that Rogers stopped beating Martin in order to tie him up and to converse with other inmates demonstrates that there was a certain amount of restraint regarding the crime. According to Dr. Prichard, Rogers did not act wholly on impulsivity or just "lose control." Dr. Prichard also opined that the homicide of Martin was not committed while Rogers was under the influence of an extreme mental or emotional disturbance. Dr. Prichard said that the murder was calculated, premeditated, and not based on any mental illness. In Dr. Prichard's opinion, at

- 25 -

the time of the crime, Rogers had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law. Further, by Rogers' own admissions, he planned for roughly a month to kill a white man in retaliation for the shooting of Trayvon Martin and he intended "to kill [Ricky Martin] in the cell that night." Rogers also told Martin during the attack, that the purpose of the attack was revenge for white people killing Trayvon Martin and other black people. Finally, Rogers admitted that Martin did not provoke him or resist the attack in any way and that he killed Martin for "no good reason." *See Smith v. State*, 28 So. 3d 838, 867 (Fla. 2009) ("CCP may be established by . . . 'lack of resistance or provocation . . . .' " (quoting *Swafford v. State,* 533 So. 2d 270, 277 (Fla. 1988))). Thus, there is competent, substantial evidence in the record to support the finding of the CCP aggravator.

Even if Rogers had preserved his objection to the CCP instruction, and we determined that the CCP instruction was given or the findings were made in error, Rogers would still not be entitled to relief since any error would be deemed harmless. The trial court specifically stated in the sentencing order that "even if the CCP factor were not proven and was accorded no weight, the Court's sentencing decision would remain the same. The combined weight [of] the other four aggravating circumstances, without considering CCP whatsoever, far outweigh the mitigating circumstances presented." Thus, even if the application of

the CCP aggravator were erroneous, any such error would be found to be harmless beyond a reasonable doubt because there is no reasonable possibility that trial court would have imposed a life sentence had it not found this aggravator applicable. *See Calhoun v. State*, 138 So. 3d 350, 362 (Fla. 2013) (holding that any error in finding an impermissible aggravator is harmless beyond a reasonable doubt if there is no reasonable possibility that the evidence presented in mitigation is sufficient to outweigh the remaining aggravators).

### D. Analysis of the prior violent felony aggravator

Rogers claims that in the process of analyzing the prior violent felony aggravator, the trial court improperly focused on Rogers' "illegal use of violence against other people" but that Rogers was not actually convicted of a violent crime as a result of his use of "illegal violence against other people." Rogers is mistaken.

In analyzing this aggravator, the trial court wrote:

> It is uncontroverted that the Defendant was previously convicted of three felonies involving the use or threat of violence to another person. § 921.141(6)(b). In 1997, the Defendant was convicted of attempted robbery in the first degree and sentenced to 27 to 54 months in prison in New York County case number 906-97. The conviction arose from an incident during which the Defendant used a gun to rob a man on a train platform.
>
> In addition, as previously mentioned, the Defendant was previously convicted of robbery with a firearm and aggravated battery with a deadly weapon in Volusia County, Florida. During the criminal episode in Volusia County, the Defendant robbed a cab driver and used the gun to strike the driver in the mouth. When the Defendant battered the driver, he knocked out one of the driver's teeth.

- 27 -

In a letter to Judge Goodman dated March 31, 2013, the Defendant stated "I have a tendency to be very violent with little or no provocation. A problem I see that is only getting worse as the years go by." These undisputed facts demonstrate that the Defendant has used illegal violence against other people. The Defendant's pattern of criminal conduct has escalated to the point where the Defendant himself has testified he murdered a cellmate because, in part, of the victim's "vibe."

This aggravating factor is given great weight.

Contrary to Rogers' assertion, the trial court clearly did not conclude that the prior violent felony aggravator was proven beyond a reasonable doubt based on conduct that did not result in criminal convictions. The illegal use of violence against other people on which the trial court focused was Rogers' prior conviction for attempted robbery in 1997, during which Rogers used a gun, and his 2002 convictions for robbery with a firearm and aggravated battery with a deadly weapon. Although the trial court included a quotation from a letter Rogers wrote in which he stated that his tendency to be very violent with little or no provocation is getting worse, the trial court did not refer to any speculative future violence or any violence that did not result in a criminal conviction when analyzing this aggravator. Thus, this claim is without merit.

### E. Sufficiency of the sentencing order

Rogers asserts that the trial court failed to thoughtfully and comprehensively analyze any of the proposed mitigating circumstances in accordance with our decision in *Campbell v. State*, 571 So. 2d 415, 419-20 (Fla. 1990), *receded from on*

*other grounds by Trease v. State*, 768 So. 2d 1050, 1055 (Fla. 2000), failed to expressly and specifically articulate why the established mitigating circumstances were given relatively limited weight, and instead summarily disposed of all sixty-eight mitigating circumstances.

In *Campbell*, we articulated the requirements regarding the manner in which a trial court must weigh aggravating and mitigating circumstances in its written sentencing order. We have summarized the requirements for a capital sentencing order under *Campbell* and its progeny as follows:

A trial judge must

> (1) expressly evaluate in his or her written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature; (2) assign a weight to each aggravating factor and mitigating factor properly established; (3) weigh the established aggravating circumstances against the established mitigating circumstances; and (4) provide a detailed explanation of the result of the weighing process.

*Orme v. State*, 25 So. 3d 536, 547-48 (Fla. 2009). "[T]he determination of mitigating and aggravating circumstances and the respective weight assigned to each [are] within the trial court's discretion . . . ." *Griffin v. State*, 820 So. 2d 906, 913 (Fla. 2002).

Contrary to Rogers' argument, the sentencing order here does expressly evaluate each proposed mitigator (including finding twenty-five mitigators that

- 29 -

were not found by the jury). It also decides whether the nonstatutory mitigators were truly mitigating, assigns a weight to each aggravator and mitigator properly established, and weighs the aggravators against the mitigators.

In *Oyola v. State*, 99 So. 3d 431, 447 (Fla. 2012), we stated that "the sentencing order violated the requirements articulated in *Campbell*" because the trial court "merely gave a brief summary of its findings with regard to the mitigators, and did not expressly and specifically articulate why the evidence presented . . . warranted the allocation of slight weight to the nonstatutory mitigation evidence presented." Our decision in *Campbell*, however, did not impose a requirement that a trial court expressly and specifically articulate why the evidence presented warranted only the allocation of a certain weight to a mitigating circumstance. Because *Oyola* mischaracterizes our decision in *Campbell*, we now recede from *Oyola* to the extent that it employed a requirement that a trial court expressly articulate why the evidence presented warranted the allocation of a certain weight to a mitigating circumstance.

Rogers also raises the complaint that the trial court twice referred to incorrect mitigating circumstances in its analysis. This is true. When intending to analyze proposed mitigating circumstance 19, that the death of Rogers' maternal grandmother was traumatic for him, the trial court instead considered whether Rogers had ever been shown love or affection. And when intending to analyze

proposed mitigating circumstance 52, whether Rogers had established that he suffers from attachment issues, it appears that the trial court actually analyzed whether Rogers had cared for homeless boys on the streets. Neither the jury nor the court found that either mitigating circumstance 19 or 52 was established.

The decision whether a mitigating circumstance has been established is within the trial court's discretion and reviewed only for abuse of discretion. *Ault v. State*, 53 So. 3d 175, 187 (Fla. 2010); *Foster v. State*, 679 So. 2d 747, 755 (Fla. 1996). "[A] trial court's findings on mitigation are . . . subject to review for harmless error, and this Court will not overturn a capital appellant's sentence if it determines that an error was harmless beyond a reasonable doubt." *Ault*, 53 So. 3d at 187.

We find no abuse of discretion with the trial court failing to find that proposed mitigating circumstance 19 was established. Although there was evidence presented that Rogers grieved the loss of his grandmother and that he did not properly grieve that loss, there was no evidence that the loss was "traumatic" to him. As to proposed mitigating circumstance 52, there was unrebutted evidence presented by both Dr. Dunn and Dr. Harper that Rogers suffers from attachment issues. And the trial court did not make any finding that Dr. Dunn's or Dr. Harper's testimony was not credible. Thus, we conclude that the trial court did abuse its discretion in failing to find that proposed mitigating circumstance 52 was

- 31 -

established by the greater weight of the evidence.  But this error was harmless beyond a reasonable doubt because there is no reasonable possibility that the trial court would have imposed a life sentence based on Rogers' attachment issues, given the five weighty aggravating circumstances present here.  *See Orme*, 25 So. 3d at 544 (concluding that trial court's failure to consider remorse as a mitigating circumstance was harmless in light of the three aggravators—HAC, commission during a sexual battery, and pecuniary gain—and relatively weak mitigation). Rogers is therefore not entitled to relief on this claim.

### F.  Sufficiency of the evidence

Although Rogers does not challenge the sufficiency of the evidence to sustain his conviction for first-degree murder, this Court independently reviews the record in death penalty cases to determine whether competent, substantial evidence supports the conviction.  Fla. R. App. P. 9.142(a)(5) ("On direct appeal in death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.").  "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001).  Our duty on appeal is "to review the record in the light most

favorable to the prevailing theory and to sustain that theory if it is supported by competent[,] substantial evidence." *Orme v. State*, 677 So. 2d 258, 262 (Fla. 1996). "A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation." *Crain v. State*, 894 So. 2d 59, 73 (Fla. 2004).

To establish first-degree premeditated murder, the State was required to prove the following elements: (1) Ricky Martin is dead; (2) the death was caused by the criminal act of Rogers; and (3) there was a premeditated killing of Ricky Martin. Fla. Std. Jury Instr. (Crim.) 7.2.[3] Martin's medical records, the testimony of a nurse practitioner from the hospital where he was treated and died, and testimony from the medical examiner were sufficient to prove that Ricky Martin is dead. Rogers admitted that he punched Martin in the face several times without provocation, that he stomped his head into the concrete floor, that he kicked him in the face several times, that he tied Martin up when Martin tried to get up off the

---

3. Alternatively, to prove first-degree felony murder, the State was required to prove the following three elements: (1) Ricky Martin is dead; (2) while engaged in the commission of kidnapping, Rogers caused the death of Ricky Martin, or while engaged in the attempt to commit kidnapping, the death occurred as a consequence of and while Rogers was engaged in the kidnapping of Ricky Martin; and (3) Rogers was the person who actually killed Ricky Martin. *See* Fla. Std. Jury Instr. (Crim.) 7.3. We also conclude that there was competent, substantial evidence presented to sustain a conviction under the felony murder theory.

floor, and that he "killed Ricky Martin" and is "responsible for the death of Ricky Martin." These admissions are sufficient to prove that Martin's death was caused by the criminal act of Rogers. Finally, Rogers admitted in the unchallenged portions of the letter to the predecessor judge that his "intentions were to kill [Ricky Martin] in the cell that night," and that after hearing about the shooting of Trayvon Martin, he "decided that [he] was going to kill the next white man that came across [his] path." These unchallenged statements are sufficient to prove that the killing of Ricky Martin was premeditated. Together, these facts provide competent, substantial evidence to sustain a conviction of first-degree premeditated murder.

## G. Proportionality

Finally, Rogers argues that his death sentence is disproportionate because his case is not among the least mitigated first-degree murder cases. Given the relatively weak mitigation in this case, we reject this argument.

To ensure uniformity of sentencing in death penalty proceedings, this Court considers the totality of circumstances and compares each case with other capital cases. We do not simply compare the number of aggravating and mitigating circumstances. *Taylor v. State*, 937 So. 2d 590, 600 (Fla. 2006). "Further, in a proportionality analysis, this Court will accept the weight assigned by the trial court to the aggravating and mitigating factors." *Hayward v. State*, 24 So. 3d 17,

46 (Fla. 2009). "In performing a proportionality review, a reviewing court must never lose sight of the fact that the death penalty has long been reserved for only the most aggravated and least mitigated of first-degree murders." *Urbin v. State*, 714 So. 2d 411, 416 (Fla. 1998).

Here, the trial court found that five aggravating factors—including prior violent felony, CCP, and HAC—were proven beyond a reasonable doubt. Three of the five aggravators found in this case are among the weightiest aggravators in Florida's statutory scheme. *Hodges v. State*, 55 So. 3d 515, 542 (Fla. 2010) (prior violent felony and HAC); *Wade v. State*, 41 So. 3d 857, 879 (Fla. 2010) (HAC and CCP), *receded from on other grounds by McCloud v. State*, 208 So. 3d 668, 687 (Fla. 2016). Neither the trial court nor the jury found that any statutory mitigating circumstances were established, but the trial court did find that forty-nine nonstatutory mitigating circumstances were established. And although the trial court found forty-nine mitigating circumstances, proportionality review is "not a mere numbers game." *Rigterink v. State*, 66 So. 3d 866, 899 (Fla. 2011). Many of the mitigating circumstances in this case were repetitive and cumulative. For example, eleven of the circumstances were related to Rogers' family dysfunction, eleven of the circumstances related to Rogers' difficult childhood, seven of the circumstances related to his head and brain injuries, and five of the circumstances related to the love and care he has for his family members.

We have found the death sentence proportionate in cases with similar aggravation and mitigation. In *White v. State*, 817 So. 2d 799 (Fla. 2002), White and a codefendant severely beat the victim and then stabbed her to death. The death sentence was found to be proportionate where the trial court found four aggravators: (1) prior violent felony; (2) while engaged in the commission of a kidnapping; (3) committed to disrupt or hinder the enforcement of laws; and (4) HAC. 817 So. 2d at 803 n.2. In mitigation, the trial court found the statutory mitigator that White was under the influence of an extreme mental or emotional disturbance and nonstatutory mitigators similar to those in the instant case, including poor family background, parental neglect, organic brain damage and neurological deficiencies. *Id.* at 803 n.3. The court also found more significant mitigation than in Rogers' case, including: an extensive history of alcohol and substance abuse from an early age; marginal intelligence or a low IQ; and that White was intoxicated and had diminished capacity at the time of the crime, was a willing worker and a good employee, lacked future dangerousness, had the potential to be rehabilitated, had a good prison record, and had contributed to the community. *Id.*

In *Globe v. State*, 877 So. 2d 663, 666-67 (Fla. 2004), Globe strangled a fellow inmate to death. The trial court found four aggravators: under sentence of imprisonment, prior violent felony, HAC, and CCP. 877 So. 2d at 668 n.3. The

- 36 -

court found no statutory mitigating circumstances and eleven nonstatutory

mitigators:

> (1) Globe's abusive relationship with his parents—given little weight;
> (2) Globe was a good friend to other inmates—given slight weight;
> (3) Globe met the criteria for antisocial personality disorder—given
> slight weight; (4) Globe gave confessions and made statements about
> committing the murder—given slight weight; (5) Globe's history of
> substance abuse—given slight weight; (6) charitable deeds done by
> Globe for a fellow inmate—given slight weight; (7) Globe's mother's
> love for him—given slight weight; (8) Globe's appropriate conduct
> throughout the trial—given little weight; (9) Globe was helpful to
> others—given slight weight; (10) Globe's capacity to form
> relationships—given slight weight; and (11) Globe did not have a
> positive role model as a child, was berated, and as a teenager was
> unwanted—given slight weight.

*Id.* at 668 & n.4.

The facts and aggravation and mitigation in *Globe* are very similar to the

instant case. Here, the additional aggravation of the murder being committed

while Rogers was engaged in the commission of a kidnapping was present. And

while the mitigation is similar, Rogers also has evidence of head and brain injuries

that were found to be mitigating.

We have also upheld death sentences in cases with less aggravation and

more compelling mitigation. *E.g.*, *Abdool v. State*, 53 So. 3d 208, 215 (Fla. 2010)

(concluding that the death penalty was proportionate where there were two

aggravating factors, four statutory mitigating circumstances (age of nineteen at the

- 37 -

time of the crime, no significant history of criminal activity, and both statutory mental health mitigators), and forty-eight nonstatutory mitigating circumstances).

In light of the presence of three of the weightiest aggravating circumstances and the relatively weak mitigation in this case, we conclude that Rogers' death sentence is proportionate as compared with other capital cases.

### III.  CONCLUSION

Having reviewed Rogers' claims as well as the sufficiency of the evidence, we affirm the judgment of conviction and sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, LAGOA, LUCK, and MUÑIZ, JJ., concur.
LABARGA, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in part and dissenting in part.

I concur with the decision of the majority to affirm the judgment and sentence of death.  I write separately to emphasize two points and dissent as to one other.  First, although the majority correctly notes that *Hurst v. State*, 202 So. 3d 40, 53 (Fla. 2016), stated "before a sentence of death may be considered by the trial court in Florida, the jury must find the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating

- 38 -

circumstances," we also held that these findings must be *unanimous*. *See id.* at 57. We further held that the jury recommendation must be unanimous for a trial court to impose a sentence of death. *Id.*[4] As the majority notes, the trial court here complied with *Hurst* and instructed the jury as to the unanimity requirement with respect to each finding and the recommendation.

On this same topic, however, I must voice my disagreement with the decision of the majority to refer to certain findings mandated by *Hurst* as "determinations." This terminology is contrary to the language used in *Hurst*. *See* 202 So. 3d at 44 ("In capital cases in Florida, the[] *specific findings* required to be made by the jury include the existence of each aggravating factor that has been proven beyond a reasonable doubt, the finding that the aggravating factors are sufficient, and the finding that the aggravating factors outweigh the mitigating circumstances." (emphasis added)); *id.* at 59 ("[W]e conclude that under the commandments of *Hurst v. Florida*, Florida's state constitutional right to trial by jury, and our Florida jurisprudence, the penalty phase jury must be unanimous in

---

4. This holding has been repeated many times, including in the decision where we amended the capital jury instructions to comply with *Hurst*. *See In re Std. Jury Instrs. in Capital Cases*, 244 So. 3d 172, 173 (Fla. 2018) (quoting *Hurst*, 202 So. 3d at 54); *see also Patrick v. State*, 246 So. 3d 253, 264 (Fla. 2018) (quoting *Hurst*, 202 So. 3d at 57); *Gregory v. State*, 224 So. 3d 719, 737-38 (Fla. 2017) (quoting *Hurst*, 202 So. 3d at 54).

making the *critical findings* and recommendation that are necessary before a sentence of death may be considered by the judge or imposed." (emphasis added)).

In deciding what were the "critical findings" to be made by the jury as a matter of Florida law, we looked to the language of Florida's sentencing statutes in effect at that time. First, we quoted section 775.082(1), Florida Statutes (2012), which provided:

> (1) A person who has been convicted of a capital felony shall be punished by death if the proceeding held to determine sentence according to the procedure set forth in s. 921.141 *results in findings by the court that such person shall be punished by death, otherwise such person shall be punished by life imprisonment* and shall be ineligible for parole.

*Hurst*, 202 So. 3d at 52. We then quoted section 921.141, Florida Statutes (2012), which provided:

> (1) SEPARATE PROCEEDINGS ON ISSUE OF PENALTY.—Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized by s. 775.082 . . . .
> (2) ADVISORY SENTENCE BY THE JURY.—After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:
> (a) Whether *sufficient aggravating circumstances exist* as enumerated in subsection (5);
> (b) Whether *sufficient mitigating circumstances exist which outweigh the aggravating circumstances* found to exist; and
> (c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.
> (3) *FINDINGS* IN SUPPORT OF SENTENCE OF DEATH.— Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances,

shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its *findings upon which the sentence of death is based as to the facts*:

  (a) That *sufficient aggravating circumstances* exist as enumerated in subsection (5), and

  (b) *That there are insufficient mitigating circumstances to outweigh the aggravating circumstances.*

*Hurst*, 202 So. 3d at 52 (some emphasis added) (some alterations in original).

Although Florida's sentencing statutes have changed since the issuance of *Hurst*, the title of section 921.141(2), Florida Statutes (2018), is "Findings and recommended sentence by the jury," and that subsection lists precisely what we held in *Hurst* to be the "critical findings" that must be found unanimously by a jury before a sentence of death may be recommended:

  (2) Findings and recommended sentence by the jury.—This subsection applies only if the defendant has not waived his or her right to a sentencing proceeding by a jury.

  (a) After hearing all of the evidence presented regarding aggravating factors and mitigating circumstances, the jury shall deliberate and determine if the state has proven, beyond a reasonable doubt, the existence of at least one aggravating factor set forth in subsection (6).

  (b) The jury shall return findings identifying each aggravating factor found to exist. A finding that an aggravating factor exists must be unanimous. If the jury:

   1. Does not unanimously find at least one aggravating factor, the defendant is ineligible for a sentence of death.

   2. Unanimously finds at least one aggravating factor, the defendant is eligible for a sentence of death and the jury shall make a recommendation to the court as to whether the defendant shall be sentenced to life imprisonment without the possibility of parole or to death. The recommendation shall be based on a weighing of all of the following:

    a. Whether *sufficient aggravating factors* exist.

> b. Whether *aggravating factors exist which outweigh the mitigating circumstances found to exist*.
> c. Based on the considerations in sub-subparagraphs a. and b., whether the defendant should be sentenced to life imprisonment without the possibility of parole or to death.
>
> (c) If a unanimous jury determines that the defendant should be sentenced to death, the jury's recommendation to the court shall be a sentence of death. If a unanimous jury does not determine that the defendant should be sentenced to death, the jury's recommendation to the court shall be a sentence of life imprisonment without the possibility of parole.

§ 921.141, Fla. Stat. (2018) (emphasis added). A finding does not suddenly cease to be a finding simply because the statute has been reworded to remove certain references to "findings" and add the word "determine."

Finally, although I concur with the decision of the majority to recede in part from *Oyola*, the importance of compliance with *Campbell v. State*, 571 So. 2d 415 (Fla. 1990), with respect to sentencing orders cannot be overemphasized. This is because "the ultimate penalty of death cannot be remedied if erroneously imposed," *Walker v. State*, 707 So. 2d 300, 319 (Fla. 1997), and this Court must be able to conduct a meaningful review of an order that sentences a defendant to death. *See Ferrell v. State*, 653 So. 2d 367, 371 (Fla. 1995). As we explained over two decades ago:

> [T]rial courts have the undelegable duty and solemn obligation to not only consider any and all mitigating evidence, but also to "expressly evaluate in [their] written order[s] each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence." *Campbell*, 571 So. 2d at 419; *Ferrell v. State*, 653 So. 2d

- 42 -

367, 371 (Fla. 1995) (reaffirming *Campbell* and establishing
enumerated requirements for treatment of mitigating evidence).

This bedrock requirement cannot be met by treating mitigating
evidence as an academic exercise which may be summarily addressed
and disposed of.

*Walker*, 707 So. 2d at 319 (some alterations in original).

The more detailed the sentencing order, the greater this Court's ability to

perform its critical task of determining whether a trial court's "final decision in the

weighing process [is] supported by 'sufficient competent evidence in the record.' "

*Campbell*, 571 So. 2d 420 (quoting *Brown v. Wainwright*, 392 So. 2d 1327, 1331

(Fla. 1981)). While *Campbell* delineates the minimum requirements for a

sentencing order to be sufficient, nothing precludes trial courts from providing

detailed analyses beyond the requirements of *Campbell* with respect to the finding

and weighing of aggravating factors and mitigating circumstances, thereby greatly

aiding in this Court's meaningful review in death penalty cases.

An Appeal from the Circuit Court in and for Santa Rosa County,
    John F. Simon, Jr., Judge - Case No. 572017CF000804CFAXMX

Andy Thomas, Public Defender, and Richard M. Bracey, III, Assistant Public
Defender, Second Judicial Circuit, Tallahassee, Florida,

    for Appellant

Ashley B. Moody, Attorney General, and Jennifer A. Donahue, Assistant Attorney
General, Tallahassee, Florida,

    for Appellee